EMSCOR MANUFACTURING, INC.; Walter P. Manning, Jr.; Cindy R. Ketcher, Individually and as Administratrix on Behalf of the Estate of Steven Ketcher; Carolyn J. Ketcher; Kristina Heilman Weaver, Individually and as Next Friend of Lyndsey Michelle Weaver and as Administratrix on Behalf of the Estate of Michael Weaver; and Charles D. Weaver, Appellants,

v.

ALLIANCE INSURANCE GROUP; Alliance Syndicate, Inc.; and Alliance General Insurance, Appellees.

No. B14–92–01121–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Motion for Rehearing Granted, Majority and Dissenting Opinions Feb. 3, 1994, Withdrawn.

Substitute Majority and Dissenting Opinions on Rehearing May 19, 1994.

Rehearing Denied June 23, 1994.

Earl Landers Vickery, Houston, for appellants.

Linda M. Cipriani, Michael O. Connelly, of Houston, for appellees.

Before MURPHY, SEARS and DRAUGHN, JJ.

## MAJORITY OPINION ON REHEARING

MURPHY, Justice.

This is an excess carrier insurance case. Appellants, Walter P. Manning Jr. (Emscor's

former President) and Emscor Manufacturing, Inc. (collectively referred to as "Emscor"), filed suit against appellees, Alliance Insurance Group, Alliance Syndicate, Inc., and Alliance General Insurance (collectively referred to as "Alliance"), claiming that Alliance was liable for wrongfully refusing to settle a negligence suit filed against Emscor. The trial court granted summary judgment in favor of Alliance on all of Emscor's causes of action and Emscor appealed. We affirm.

As we will detail, the relationship between Emscor and Alliance has a lengthy history. On February 28, 1987, Emscor purchased an excess insurance policy (the policy) from Alliance. The policy was effective from February 28, 1987, through February 28, 1988. It provided comprehensive general liability coverage in the amount of $500,000 as excess over and above a primary comprehensive general liability policy in the amount of $500,000 issued to Emscor by Stone Mountain Insurance Company (Stone Mountain). Pursuant to the policy, Alliance was required, when and if certain conditions were met, to indemnify Emscor up to $500,000 for losses which were covered by Stone Mountain's policy, and which were in excess of Stone Mountain's $500,000 policy limit. On April 25, 1987, a crane collapsed, injuring and ultimately causing the deaths of Steven Ketcher and Michael Weaver. In May 1987, the families of the dead men sued Emscor and several other defendants in connection with the accident (the *Ketcher* litigation).[1] On July 26, 1988, Stone Mountain was placed into receivership. Emscor subsequently tendered a bill for legal fees and expenses incurred in the *Ketcher* litigation to Alliance. On September 23, 1988, Alliance informed Emscor that it would not pay those fees and expenses because it was not obligated under the terms of the policy to "drop down" and replace the primary coverage in the event of the primary insurer's insolvency.

On January 26, 1990, Emscor filed a declaratory judgment action to determine whether Alliance was required by the terms of the policy to provide a defense to Emscor in the *Ketcher* suit. The trial court granted Alliance's motion for summary judgment based upon the language of the policy and denied Emscor's cross-motion for summary judgment. Emscor appealed the trial court's ruling to this court. *See Emscor Mfg., Inc. v. Alliance Ins. Group*, 804 S.W.2d 195 (Tex. App.—Houston [14th Dist.] 1991, no writ).

During the pendency of that appeal, Emscor began settlement negotiations with the *Ketcher* plaintiffs. On March 7, 1990, counsel for Emscor wrote to Alliance, stating that "serious settlement negotiations" were about to begin in the *Ketcher* suit and demanding that Alliance tender the limits of its coverage. Emscor's counsel advised Alliance that unless it came forward "immediately" to tender the $500,000 in excess coverage, he would make "any arrangements or deals," with other counsel to protect his clients.[2] In response, almost two months later, Alliance asked to review the case with Emscor and inquired about a number of issues related to possible settlement of the *Ketcher* suit, including whether any monies were available from the [State Board of Insurance] Guaranty Fund and whether any specific settlement demands had been made. On May 10, 1990, Emscor expressed its willingness to review the case and advised that it was continuing to work with the Guaranty Fund to determine how much, if any, money would be available from the Fund. The meeting between the attorneys for Emscor and Alliance took place on May 22, 1990. Following that meeting, Alliance asked to be kept informed of all significant developments with respect to the *Ketcher* suit.

Throughout the next several months, Emscor attempted to obtain a commitment of settlement funds from the Guaranty Fund. In fact, in July 1990, Emscor sent Alliance a copy of a correspondence it had received from the Guaranty Fund. That correspon-

---

1. The families are parties to this appeal as judgment creditors and partial assignees of Emscor.

2. All communication discussed herein, unless otherwise indicated, involved correspondence which was sent to, and/or received by, the respective counsel for Emscor and Alliance.

dence stated that the Proof of Claim forms filed by Emscor were "sufficient to provide up to $500,000 indemnity coverage to Emscor." In response, Alliance "congratulated" Emscor for apparently obtaining "the Board's commitment to step into the shoes of Stone Mountain and provide $500,000 in primary coverage to Emscor in connection with the *Ketcher* litigation." However, Alliance reiterated the fact that its policy was in excess of the primary policy and that it was not required to pay monies until the first $500,000 in primary coverage was exhausted. Alliance further stated that "as soon Alliance has received evidence that the Board has in fact paid $500,000 to Emscor and/or its attorneys in connection with this case, Alliance will make its coverage available."

In August 1990, Emscor notified Alliance that the *Ketcher* plaintiffs had agreed to settle against *all* of the *Ketcher* defendants for $8,000,000. Emscor reminded Alliance of the November 12, 1990, trial date and requested Alliance to "authorize" its policy limits for settlement. In response, Alliance asked for a case assessment and inquired about Emscor's progress with the Guaranty Fund. Emscor obliged and reassured Alliance that it was "working vigorously with the Texas Guaranty Fund to obtain a commitment to pay the $500,000 primary limits."

On September 17, 1990, Emscor notified the Guaranty Fund and Alliance that the *Ketcher* plaintiffs had settled with all of the defendants except Emscor. The letter sought confirmation from the Guaranty Fund on whether it had received "all information necessary to make a final determination on releasing settlement funds." One week later, Emscor reported to Alliance that it was continuing to "work closely" with the Guaranty Fund, but that the process was "slow and tedious." Emscor also inquired as to whether Alliance would contribute its excess coverage to add to any amount contributed by the Guaranty Fund and whether Alliance would assume Emscor's defense in the event that it did not exhaust its policy limits. Emscor further informed Alliance that it was considering an assignment of its "rights to any

Guaranty Fund proceeds as well as a certain amount for excess coverage from Alliance." On September 25, 1990, Alliance objected to any assignment and stated that it would not authorize any of its excess coverage until the Guaranty Fund "at least authorizes" the payment of the initial $500,000. Alliance also asked for Emscor's commitment to settle the case "for as little as possible above $500,000" and repeated its pledge "to wrap up the case when and if the Guaranty Fund pays or agrees to pay $500,000."

On October 19, 1990, Emscor faxed to Alliance and the Guaranty Fund, the *Ketcher* plaintiffs' $1,000,000 settlement demand in the underlying suit. Although it indicated that Emscor had yet to obtain monies from the Guaranty Fund, the settlement demand stated that it was contingent upon Alliance's payment of its $500,000 policy limit. The demand also stated that it would expire on October 26, 1990. On October 24, 1990, two days before the *Ketcher* settlement demand was to expire, counsel for Alliance faxed a lengthy response to counsel for Emscor. In pertinent part, Alliance's counsel stated as follows:

> Let me reiterate again as I have before, that we believe we have worked with you in the past and are working with you currently to make decisions regarding the *Ketcher* litigation, the resolution of that litigation, and the resolution of any other litigation against Emscor arising out of the April 1987 accident. I have told you before, and again tell you, that if and when the *Texas Guaranty Fund and/or Emscor* provides evidence to us that they *have made arrangements to pay the first $500,-000* of any settlement in this case, we will respond promptly to try to arrive at a mutually agreeable resolution of the litigation.
>
> Alliance recognizes its obligations under the excess Alliance policy issued to your client, and is fully prepared to meet those obligations *when* the policy's provisions are invoked. The Plaintiffs' settlement demand has put Alliance on notice that the Plaintiffs in *Ketcher* are demanding an

amount of money that *may* invoke the provisions of the Alliance policy if: a) *the Guaranty Fund and/or Emscor agrees to pay $500,000* ; and b) the Plaintiffs are unwilling to settle for $500,000. However, Alliance does not believe its policy, and I do not believe the *Stowers* doctrine or any other Texas case law or statute, requires us to now 'assume the defense' or 'settle the case' pursuant to the Plaintiffs' October 19, 1990, demand letter. I also do not believe Alliance can be held responsible for the apparent fact that the Texas Guaranty Fund has not yet made any commitment to you in terms of primary coverage. I appreciate your desire to resolve this case now, if it can be resolved, without going to the additional time and expense to present witnesses for deposition, complete discovery, and prepare for trial. I have been in that position before, and I know it is not pleasant. **However, under its policy, Alliance is unable to move forward in any way until the Texas Guaranty Fund and/or Emscor pays the first $500,000 demanded by the Plaintiffs in this case.**

[italics and bold added]

Alliance's counsel also stated that she was going to meet with her client to further discuss the case. The next day, October 25, 1990, Emscor sent a fax to Alliance, expressing its understanding "that Alliance would contribute all or part of its $500,000 coverage once the Texas State Board of Insurance Guaranty Fund or Emscor has paid the first $500,000." Emscor advised Alliance that it would take whatever steps were necessary to reach the first $500,000 in coverage, but that its efforts were not to be interpreted as a waiver of its position that Alliance "immediately meet the *Ketcher* plaintiffs' settlement demand and assume Emscor's defense." Emscor again faxed Alliance at 2:30 p.m. on October 26, 1990, the day the *Ketcher* settlement offer was to expire, and demanded Alliance's offer of settlement funds "today." That same day at 4:30 p.m., Emscor once again faxed Alliance, stating that Alliance's October 24 letter had set forth "unconscionable conditions" on payment. Emscor in-

formed Alliance that it had been "unsuccessful thus far in obtaining settlement funds from the Texas Guaranty Fund" and that its "ability to continue business and meet its cash flow obligations would be severely impaired" if it were forced "to pay $500,000 of its own money." Alliance responded by fax on October 26, 1990. Alliance's counsel, stated in pertinent part:

> In response to your October 26, 1990, fax and as I am sure the Plaintiffs are aware, Alliance is not in a position to respond to the *Ketcher* plaintiffs settlement demand unless and until the *Texas Guaranty Fund or your insured,* or both, give Alliance sufficient assurance that they have paid and/or *have agreed to pay* and/or have incurred expenses sufficient to invoke Alliance's excess policy coverage. As I sit here at 4:30, Alliance has not been given any of this information because to my knowledge, none of these events have occurred. The Plaintiffs should be told that if and when Alliance is given any of these assurances, Alliance will be prepared to respond to their current settlement proposal, and that I am meeting with Alliance on November 5, 1990, for just that purpose.

[emphasis added]

On October 31, 1990, five days after the *Ketcher* settlement demand was supposed to have expired, Emscor faxed a letter and attached a "Confirmation of Settlement Demand" to Alliance. Those documents, when taken together, state that Emscor had "agreed to obligate" itself to pay $500,000 to the *Ketcher* plaintiffs and that the *Ketcher* plaintiffs had "agreed to accept this $500,000 obligation" and release all claims *"only if* Alliance obligates itself to pay its $500,000 excess policy limits." [emphasis in original] Emscor also advised Alliance that it was willing to give a letter of guaranty to reflect its "obligation" and that it needed to know "immediately whether the guaranty will be sufficient to invoke the $500,000 excess coverage with Alliance." Emscor further informed Alliance that the deadline for acceptance of this latest settlement proposal was at 5:00 p.m., November 5, 1990.

The next day, Alliance inquired as to when the money would be paid and whether the guaranty would be secured. More importantly, Alliance stated its position that "a promise to pay by Emscor to pay the Plaintiffs sometime in the future would not meet the requirements of the Alliance policy." Alliance suggested that "an irrevocable letter of credit over which the Plaintiffs had exclusive control, and which could be drawn down by the Plaintiffs when the necessary settlement documents and other Court approvals occurred, would, in all likelihood, meet the requirements of the Policy." Alliance stated that the guaranty described by Emscor "did not seem to meet" its requirements, but that it would reserve judgment until it could examine the guaranty.

On November 5, 1990, the day the settlement offer was to expire, Emscor finally faxed a copy of the executed Letter of Guaranty to Alliance. Part 3 and 4 of the Letter of Guaranty set out its terms as follows:

3. *Terms:*

For good and valuable consideration, the receipt of which is hereby acknowledged and confessed, and in further consideration the compromise and settlement of the subject litigation, Guarantors [Emscor] agree to the following terms:

a. Guarantors will pay Beneficiaries [the *Ketcher* plaintiffs] the difference, up to Five–Hundred Thousand Dollars ($500,-000), between the amount of money that the Texas State Board of Insurance Guaranty Fund approves for payment as a result of the claims filed with the Guaranty Fund in the subject litigation, and the total sum of Five–Hundred Thousand Dollars ($500,000).

b. Before Guarantors are obligated to pay Beneficiaries anything, Beneficiaries are obligated to exhaust all efforts and remedies to collect up to Five–Hundred Thousand Dollars ($500,000) from the Texas State Board of Insurance Guaranty Fund.

c. After Beneficiaries have exhausted all efforts and remedies stated above in Paragraph 3(b) then Guarantors shall immediately become obligated upon thirty (30) days written demand of Beneficiaries to pay the amount due following the directives of Paragraph 3(a) above.

d. Guarantors' obligations to Beneficiaries are irrevocable and unconditional.

4. *Security:*

To secure this Guaranty, and as inducement to Beneficiaries to accept this Guaranty, Emscor, Inc. hereby grants to Beneficiaries a security interest in and to all assets and properties of Emscor, Inc. and Emscor, Inc. agrees to execute and cause to be filed financing statements to perfect such security interest.

In the accompanying letter, Emscor stated its own conclusion that the guaranty satisfied the requirements imposed by Alliance. Emscor also stated that it had met with representatives of the Guaranty Fund and "hope[d]" that the meeting would "culminate in payment of all or some of the proofs of claims filed...." Also, the same day, Emscor faxed a letter received from the Guaranty Fund, reflecting the Board's opinion that Stone Mountain would have tendered its policy limits had it not been in receivership.

Alliance faxed a response on November 5th, informing Emscor that the Letter of Guaranty and the Guaranty Fund letter, when taken together, did not satisfy the requirements of the excess policy because they did not demonstrate that the primary coverage had been paid or would be paid before the November 12th trial setting. Although it emphasized that its coverage had not been triggered, Alliance nevertheless offered to contribute $100,000 toward settlement only when the following occurred: (1) the Guaranty Fund actually paid $500,000 pursuant to the Stone Mountain policy; or, (2) Emscor actually paid the difference between $500,000 and the amount paid or determined to be paid by the Guaranty Fund, if less than $500,000; or, (3) Emscor made its "best effort to settle the *Ketcher* suit for $600,000 or less."

The Emscor appeal of the declaratory judgment was submitted to this court on

November 6, 1990. According to Alliance, the parties met after oral argument to discuss the *Ketcher* suit. There were no further contacts between the parties until November 14, 1990, when Emscor faxed to Alliance a copy of a $3,000,000 Agreed Final Judgment between Emscor and the *Ketcher* plaintiffs. That Agreed Judgment was rendered following a hearing on November 12, 1990. Alliance did not appear at that hearing. In a letter accompanying the copy of the Agreed Final Judgment, Emscor stated that it was "compelled" to agree to the judgment "in the wake of Alliance's refusal to settle" and it demanded tender of the Alliance policy limits. In a November 16, 1990, letter to Emscor, Alliance denied any "refusal to settle" and voiced its objections to Emscor's "unilateral" settlement and subsequent demand for tender of the policy limits. On January 17, 1991, this Court issued an opinion which affirmed the trial court's ruling that Alliance had no duty to defend under the terms of the policy. *Emscor Mfg., Inc.*, 804 S.W.2d at 198–99 [emphasis added]. The opinion did not speak to the instant matters on appeal.

On May 9, 1991, Emscor filed this suit against Alliance, alleging that Alliance's failure to settle pursuant to *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved), constituted breach of contract, breach of the duty of good faith and fair dealing, negligence, gross negligence, and violated provisions of the DTPA and the Insurance Code. Alliance answered with a general denial and asserted certain affirmative defenses, including that Emscor was barred from recovery by the terms of the excess policy. On May 22, 1992, Alliance moved for summary judgment contending, among other things, that Emscor failed to meet the conditions of coverage under the policy and failed to satisfy certain conditions precedent to suit under the policy. On June 22, 1992, Emscor filed a response, contending that it met those

conditions or, in the alternative, that those conditions had been modified and waived. That same day, Emscor executed a written assignment of 75% of "all rights, claims, and causes of action against Alliance" to the *Ketcher* plaintiffs. Four days later, Alliance filed a reply to Emscor's response to the motion for summary judgment. On June 29, 1992, the trial court granted Alliance's motion for summary judgment. After its motion for new trial was overruled by operation of law, Emscor perfected this appeal.

In four points of error, Emscor contends that the trial court erred in granting Alliance's motion for summary judgment.

A movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, proof favorable to the non-movant is taken as true, the court indulging every reasonable inference and resolving any doubts in favor of the non-movant. *Id.* To prevail on summary judgment, a defendant must establish as a matter of law that there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex. 1970).

■ An insurer may be held liable for the wrongful refusal to settle a claim against the insured within policy limits. *Stowers*, 15 S.W.2d at 544. The basis for Emscor's lawsuit is Alliance's alleged wrongful refusal, despite Emscor's insistence that coverage under the policy had been triggered, to tender its policy limits during the "*Stowers* period."[3] At the outset, we note that the *Stowers* doctrine, as will discuss, has never been applied to an excess carrier like Alliance.

---

**3.** Emscor focused all of its contractual and extra-contractual claims below on whether the conditions of the policy were satisfied during the *Stowers* period. However, Emscor did not necessarily have to satisfy the Policy conditions during the

*Stowers* period for purposes of its contract claim. Nonetheless, as we will discuss, Emscor is barred from recovering on the policy by the no-action clause.

However, in the interest of justice, we will address Emscor's *Stowers* claim. The *Stowers* period extended from October 19, 1990, when Emscor first notified Alliance of the *Ketcher* plaintiffs' $1,000,000 settlement demand, until November 5, 1990, when the *Ketcher* plaintiffs' final settlement offer expired. Thus, the primary question confronting this court is whether Emscor complied with the conditions of coverage under the policy during the *Stowers* period.[4]

 Insurance policies are contracts and as such are controlled by rules of construction which are applicable to contracts generally. *Barnett v. Aetna Life Ins.*, 723 S.W.2d 663, 665 (Tex.1987). Normally, in the insurance context, the language and terms of a policy are chosen by the insurance company. *Id.* at 666. Therefore, when the language chosen is ambiguous or inconsistent, and susceptible to more than one reasonable construction, such policies should be construed strictly against the insurer and liberally in favor of coverage for the insured. *See Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex.1990); *Barnett,* 723 S.W.2d at 666. A strict construction against the insurer is required when the case involves an exception or limitation to liability under the policy. *See id.* Only when the insurance contract is expressed in plain and unambiguous language, is it unnecessary for a court to resort to the various rules of construction. *See id.* at 665. Here, the terms of the Alliance policy are plain and unambiguous.

Part 2 of the Insuring Agreements in the Alliance policy states as follows:

Limits of Liability—Underlying Limits: Liability under this policy shall attach to the Company only after the **underlying insurers have paid or have been held to pay** the full amount of their respective loss liability as described in the underlying limits and the limits of liability of the Company under this policy shall then be as shown in item 4 of the Declarations.

[emphasis added]

Condition 5 states as follows:

Attachment of Liability—Liability under this policy shall not attach unless and until the **underlying insurers shall have admitted liability for the underlying limits or unless and until the Insured has by final judgment been adjudged to pay** a sum which exceeds such underlying limits.

[emphasis added]

Thus, Alliance's coverage would have been triggered during the *Stowers* period by Emscor's compliance with any one of the following conditions:[5]

(1) The underlying insurers have paid the full amount of their respective loss liability.

(2) The underlying insurers have been held to pay the full amount of their respective loss liability.

(3) The underlying insurers shall have admitted liability for the underlying limits.

(4) The insured has by final judgment been adjudged to pay a sum which exceeds such underlying limits.

Although Emscor contends that it complied with all four conditions of the policy during the *Stowers* period, a review of the summary judgment proof shows that Emscor never triggered Alliance's excess coverage.

---

4. Alliance argues that this Court, by holding that Alliance had no duty to defend in the event of the underlying insurer's insolvency, also determined that Alliance's coverage was not triggered. *See Emscor Mfg., Inc.,* 804 S.W.2d at 198–99. However, "when coverage is triggered" presents a different question than "whether there is a duty to defend." In *Emscor,* we reviewed the identical policy to determine whether it obligated Alliance to defend Emscor in the *Ketcher* litigation. 804 S.W.2d at 197–98. [emphasis added]. As we earlier stated, while we found the policy was in the nature of an excess policy, we expressed

no opinion regarding whether the coverage under that policy had been triggered. *Id.* To the extent that Alliance argues otherwise, it misinterprets our holding in *Emscor.*

5. Alliance disputes whether Emscor could properly "step into the shoes" of the underlying insurer in order to satisfy the conditions of coverage. We need not decide this issue because even if Emscor could step into Stone Mountain's shoes, it did not satisfy the conditions of coverage under the excess policy.

## Condition 1—Paid

Emscor conceded in the trial court that it had not actually paid the underlying limits as of the hearing on November 12, 1990. Indeed, on October 26, 1990, five days before the execution of the guaranty letter, Emscor told Alliance that it was **financially unable** to pay the first $500,000 itself. In addition, there is nothing in the record to show that Emscor has paid the $500,000 underlying limit as of the time of this appeal.

The policy does not expressly state that an "agreement to pay" triggers coverage. However, Emscor contends that Alliance waived reliance, or is estopped from relying on the "actual payment" terms of the policy because Alliance "modified" those terms by its October 24th and 26th letters, requiring only that the Guaranty Fund, Emscor or both "agree to pay" or "make arrangements to pay." *See Employers Casualty Co. v. Tilley,* 496 S.W.2d 552, 561 (Tex.1973). Emscor did not make this contention during the relevant period of time preceding this lawsuit but did so only after suit was filed and Alliance had moved for summary judgment. Nevertheless, Emscor argues that there is a "fact issue" concerning whether Emscor paid the full amount of its respective loss liability, i.e., the $500,000 underlying policy limit, by executing the Letter of Guaranty on October 31, 1990.

Emscor refuses to recognize, however, that circumstances are different when dealing with an insured and an excess insurer as opposed to a primary insurer. This difference was explained by the court in *Union Indem Ins. Co. of New York v. Certain Underwriters at Lloyd's,* 614 F.Supp. 1015 (S.D.Tex.1985):

> Primary insurance coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. [citation omitted] An excess policy is one that provides that the insurer is liable for the excess above and beyond that which may be collected on primary insurance. [citation omitted] **In a situation in which there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement.** [citations omitted] In such a situation, the various insurance companies are not covering the same risk; rather, they are covering separate and clearly defined layers of risk. The remote position of an excess insurer greatly reduces its chance of exposure to a loss. This reduced risk is generally reflected in the cost of the excess policy.

614 F.Supp. at 1017. [emphasis added]

As this court recognized, an excess liability insurer has no duty to defend an insured in the event of the insolvency of the insured's primary liability insurer. *Emscor, Inc.,* 804 S.W.2d 195, 198–99 (Tex.App.—Houston [14th Dist.] 1991, no writ) (and cases cited therein). Yet, as a panel of the 5th Circuit in *Arkwright–Boston Mfr. Mut. Ins. Co. v. Aries Marine Corp.,* 932 F.2d 442, 445 (5th Cir.1991) observed, "the paradigm estoppel situation occurs when the insurer assumes the insured's defense of a claim arguably not covered by the policy, without reserving its right to deny coverage." In other words, estoppel ordinarily arises in circumstances involving a **primary** carrier where the insurer undertakes the insured's defense without first advising the insured that it might interpose a policy defense following adjudication of the injured claimant's suit against the insured.

In *Arkwright,* an excess maritime insurer, Arkwright, sought reimbursement from its insured, Aries, for the amount of the underlying primary limits paid by Arkwright to settle the claim of a worker injured aboard a vessel owned by Aries. 932 F.2d at 443–44. The primary insurer for Aries was insolvent and Aries employed counsel to defend itself. *Id.* at 444. Although the excess policy did not require Arkwright to defend Aries, Arkwright participated in settlement negotiations during the trial to protect its excess coverage. *Id.* at 444–45. When the settle-

ment agreement was reached, Aries, apparently believing that the excess policy "dropped down" in place of the primary policy, refused to tender the underlying limits requested by Arkwright and instead offered to pay only the primary policy deductible. *Id.* at 444. Rather than risking collapse of the agreement, Arkwright proceeded to pay the entire amount of the settlement. *Id.*

In the subsequent reimbursement action, Arkwright argued that the duty to disclaim coverage or reserve rights is part of the duty to defend and that the failure to reserve rights could not give rise to estoppel where there was no duty to defend. *Id.* at 445. Without directly addressing Arkwright's argument, the court held that Arkwright's participation in the settlement negotiations was not tantamount to an assumption of Aries' defense without a reservation of rights, and therefore, Arkwright was not estopped from denying responsibility under the policy for the entire amount of the settlement. *Id.* at 446.

■ Likewise, the doctrine of estoppel is inapplicable to the facts of this case. As in *Arkwright,* Alliance did not provide a defense to Emscor. In fact, when Emscor brought suit against Alliance to determine its rights under the policy, this court specifically held that Alliance had no duty to defend Emscor. *Emscor, Inc.,* 804 S.W.2d at 198–99. While it was kept informed of the progress of negotiations between Emscor and the *Ketcher* plaintiffs and periodically requested case assessments, Alliance did not in any manner participate in those negotiations or conduct what could be considered an investigation. In fact, the ongoing communication between Emscor and Alliance was merely the product of Emscor's persistent demands that Alliance assume Emscor's defense and pay its excess limits, regardless of whether the primary coverage was exhausted. Alliance properly refused those demands. Even if it could be said that Alliance somehow participated in the investigation and negotiation of the *Ketcher* suit, that conduct did not give rise to an assumption of Emscor's defense sufficient

to invoke principles of estoppel or waiver. *See Arkwright,* 932 F.2d at 446.

■ Finally, even if it could be said that Alliance somehow provided Emscor with a defense, Alliance did not voluntarily relinquish a known right or otherwise act inconsistent with the express conditions of the policy. *See Warren v. American Nat'l Ins. Co.,* 826 S.W.2d 185, 188–89 (Tex.App.—Fort Worth 1992, writ denied) (holding that excess carrier, who offered to defend insured's employee subject to reservation of rights, did not waive, or was not estopped, from asserting policy defenses). Although Alliance did not provide Emscor with a formal reservation of rights under the policy, Alliance never misrepresented its duties and obligations to Emscor. Alliance consistently told Emscor prior to the October 24th and 26th correspondence, and thereafter, that the underlying limits had to be "paid" or "exhausted" before the coverage under the Alliance policy could be triggered. In fact, in the October 24th letter which Emscor claims establishes waiver, Alliance reiterated that it was "unable to move forward in any way until the Guaranty Fund and/or Emscor **pays** the first $500,000." [emphasis added] When Emscor subsequently tried to take advantage of the "agree to pay" or "arrange to pay" language, Alliance immediately objected to any "agreement to pay" as a condition for triggering coverage under the policy.

■ More importantly, condition 10 of the policy expressly states that the terms of the policy cannot be "waived or changed except by endorsement." No such endorsement requiring only an "agreement to pay" or "arrangement to pay" the underlying limits was executed by the parties. Furthermore, the doctrine of estoppel cannot be used to create insurance coverage where none exists by the terms of the policy. *Texas Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 602–3 (Tex.1988). Emscor asserts that *Texas Farmers* is inapplicable because there was no dispute about liability coverage but only about when coverage was triggered. This is a distinction without a difference. While

Emscor was not seeking to enlarge coverage for the claims asserted against it in the underlying litigation, it was improperly attempting to expand excess coverage by creating a condition of excess coverage where none previously existed.

■ Assuming the express language of the policy can somehow be interpreted as requiring merely an "agreement to pay" or an "arrangement to pay" rather than "actual payment," as Emscor suggests, the Letter of Guaranty does not as a matter of law establish a definite and binding agreement or promise by either Emscor or the Texas Guaranty Fund to pay the underlying policy limits by November 5, 1990, when the *Ketcher* plaintiffs' final settlement demand expired. Whether the guaranty letter was sufficiently definite and binding so as to satisfy the conditions of the policy, is a matter of contract interpretation and a question of law. See e.g., *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992).

As we previously showed, the guaranty letter required the *Ketcher* plaintiffs "to exhaust all efforts and remedies" to collect the full $500,000 from the Guaranty Fund. It also granted the *Ketcher* plaintiffs a security interest in Emscor's assets and property and required Emscor, upon the exhaustion of "all efforts and remedies" and upon demand by the *Ketcher* plaintiffs, to pay "the difference up to $500,000" between the amount approved by the Guaranty Fund and $500,000, within thirty days after demand. However, the guaranty letter specifically stated that Emscor was not obligated to pay "anything," unless the *Ketcher* plaintiffs first attempted collection from the Guaranty Fund.

More importantly, the guaranty letter did not specify a time period or deadline for the *Ketcher* plaintiffs to undertake such efforts or to tender a demand, but only that such action would be taken some time in the future. In essence, Emscor was supposed to pay an uncertain amount at some time in the future after the *Ketcher* plaintiffs had at some point in time attempted to obtain an uncertain amount from the Guaranty Fund.

Although the guaranty letter stated that Emscor's "obligations" were "irrevocable" and "unconditional," that clause was meaningless because Emscor did not have any "obligations" that could be considered fixed or definite. Indeed, it is hard to imagine an agreement more vague or non-binding.

Moreover, the Guaranty Fund was not even a party to the arrangement and as Emscor now concedes, was limited by statute to a payment of $100,000 per covered claim. TEX.INS.CODE ANN. art. 21.28–C § 5(8) (Vernon Supp.1993). Yet, during the *Stowers* period, Emscor never mentioned this statutory limit and kept telling Alliance that it was trying to get the Guaranty Fund to pay the full $500,000. In fact, Emscor, after numerous attempts and despite representations to the contrary, never obtained a commitment from the Guaranty Fund to pay any amount, let alone the $200,000 maximum provided by statute.

Further, when notified on October 31, 1990, that Emscor intended to execute a letter of guaranty to reflect its "agreement to obligate itself to pay $500,000," Alliance immediately questioned the arrangement. When Emscor finally faxed an actual copy of the guaranty letter on November 5, 1990, the day the settlement demand was to expire, Alliance faxed an immediate response, notifying Emscor that the guaranty letter was insufficient. Rather than rejecting the settlement offer out of hand, Alliance countered with a $100,000 offer that, consistent with earlier representations, was contingent on the exhaustion of the underlying limits. Clearly, Alliance had no duty to tender its policy limits because neither Emscor nor the Guaranty Fund had ever paid or agreed to pay the $500,000 underlying limits.

### Condition 2—Held To Pay

■ Emscor contends that the phrase "held to pay," is synonymous with "agree to pay" and, therefore, ambiguous because it does not specify **who** could hold Emscor to pay. Emscor suggests that it could be held to pay by a court of competent jurisdiction or

could hold itself to pay by mere agreement or promise. The explanation set forth by the Emscor, however, does not make the phrase "held to pay," ambiguous. The question of whether an insurance contract is ambiguous is a question of law. *State Farm Lloyds Inc. v. Williams,* 791 S.W.2d 542, 545 (Tex.App.—Dallas 1990, writ denied). Not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity. *Forbau v. Aetna Life Ins.,* 876 S.W.2d 132, 134 (1994) (on motion for rehearing). Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* ambiguity. *Id.,* 876 S.W.2d at 134 (emphasis in original).

■ When the Policy is viewed in its entirety without isolating or giving priority to any one phrase, sentence or section, it clearly demonstrates that the phrase "held to pay" is not ambiguous. That phrase, as we will detail, is consistent with the no-action clause of the policy and plainly posits that Emscor first be "held **liable** to pay" either by judgment after a trial on the merits or by settlement agreement. *See, e.g., Hudson Ins. Co., v. Gelman Sciences Inc.,* 921 F.2d 92 (7th Cir.1990); *Highlands Ins. Co. v. Gerber Products Inc.,* 702 F.Supp. 109 (D.Md. 1988); *Vickodil v. Lexington Ins. Co.,* 412 Mass. 132, 587 N.E.2d 777 (1992). Neither of those circumstances existed **during** the *Stowers* period.

■ Assuming, for the reason stated by Emscor, the phrase "held to pay" is ambiguous and only Emscor's "promise to pay" was required, Emscor still did not satisfy this condition of the policy. As we explained, the guaranty letter executed on October 31, 1990, did not, as a matter of law, hold Emscor to pay the underlying limit because any payment was contingent solely on the *Ketcher* plaintiffs taking appropriate action at some time in the future against the Guaranty Fund. In addition, the Guaranty Fund was not a party to that arrangement or to the subsequent agreed judgment. Further, the Agreed Final Judgment, regardless of whether it was the result of a trial on the merits or a settlement agreement, was not rendered until seven days after the *Stowers* period had expired. Moreover, that agreed judgment did not obligate Emscor to pay the underlying limits because the covenant to postpone execution and assignment of rights entered into by the *Ketcher* plaintiffs and Emscor shortly thereafter, discharged Emscor from any liability for the judgment in the event that the Alliance lawsuit was compromised or settled. Emscor was plainly not "held to pay" the underlying limits, either by its own volition or by judgment during the *Stowers* period.

### Condition 3—Admitted Liability

Emscor contends that it "admitted liability" for the underlying limits in certain correspondence forwarded to Alliance. Generally, an admission is a "confession, concession or voluntary acknowledgment by a party of the existence of certain facts." BLACK'S LAW DICTIONARY 44 (5th ed. 1979). A "liability" refers generally "to an obligation one is bound in law or justice to perform; every kind of legal obligation, responsibility or duty; that which one is under obligation to pay, or for which one is liable." BLACK'S LAW DICTIONARY 823 (5th ed. 1979) (citing *Reconstruction Finance Corp. v. Gossett,* 130 Tex. 535, 111 S.W.2d 1066, 1073 (1938)). None of the correspondence described by Emscor obligated it, legally or otherwise, to pay the underlying limits.

■ While Emscor predicted in the letters of March 7th and October 19th that a verdict or judgment in the *Ketcher* litigation would probably exceed the limits of both policies, it never confessed, conceded or acknowledged any legal obligation to pay the $500,000 underlying policy limits. Also, Emscor's "agreement to obligate itself" as noted in the October 31st letter was tied solely to the Letter of Guaranty, which, as we already stated, did not obligate Emscor to pay the underlying limits. Moreover, the Letter of Guaranty did not contain a recital that confessed or conceded Emscor's legal

obligation to pay the underlying limits. In fact, it said nothing about Emscor's liability for the underlying limits. Rather, as we previously pointed out, it declared that Emscor did not have to pay anything in the absence of collection efforts by the *Ketcher* plaintiffs and spoke primarily of Emscor's future payment of an amount less than $500,-000. Obviously, Emscor did not admit liability for the underlying limits during the *Stowers* period.

### Condition 4—Adjudged To Pay By Final Judgment

■ As we earlier stated, the Agreed Final Judgment was executed on November 12, 1990, after the *Stowers* period expired, and that judgment, along with the subsequent covenant to postpone execution and assignment of rights, did not obligate Emscor to pay the underlying limits. Hence, Emscor was not adjudged to pay the underlying limits during the *Stowers* period.

■ Because Emscor failed during the *Stowers* period to comply with any of the conditions of coverage under the Alliance policy, Alliance never had a duty to settle. Therefore, this suit is barred. This lawsuit is also barred by the no-action clause.

### The "No–Action" Clause

Condition 8 of the policy, i.e., the no-action clause, states the prerequisites for bringing suit against Alliance:

> Action Against Company: **No action shall lie against the Company unless as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.**

[emphasis added]

The operative language of the above clause is that "no action shall lie against the Compa-

ny [Alliance] ... unless ... nor until" certain events occurred. Specifically, the no-action clause requires Emscor's full compliance with all the terms of the policy **and a determina-**tion of Emscor's obligation to pay either by judgment after actual trial or by written agreement of Emscor, the *Ketcher* plaintiffs, **and Alliance.** The validity of this type of clause has long been recognized in Texas. *See Guaranty County Mut. Ins. Co. v. Kline,* 845 S.W.2d 810, 811 (Tex.1993) (per curiam); *Street v. The Honorable Second Court of Appeals,* 756 S.W.2d 299, 302 (Tex.1988); *Gulf Ins. Co. v. Parker Prods., Inc.,* 498 S.W.2d 676, 679 (Tex.1973); *Great Am. Ins. Co. v. Murray,* 437 S.W.2d 264, 265 (Tex. 1969). Thus, even if Emscor had triggered coverage under the policy, Emscor could not bring this suit unless it satisfied either the "actual trial" or "written agreement" requirement of the no-action clause.

### Written Agreement

It is undisputed that Alliance did not appear at the November 12th hearing and was not a party to the Agreed Final Judgment. Thus, the Agreed Final Judgment did not constitute a "written agreement of the Insured, the claimant, **and the Company [Alliance]**" as required by the no-action clause. Similarly, the Letter of Guaranty did not satisfy the requirements of the no-action clause because not only was Alliance excluded as a party to that arrangement, but also the *instrument itself did not constitute a* **determination** of Emscor's obligation to pay or a release of Emscor's liability. Nonetheless, Emscor contends that it complied with the no-action clause because the November 12th hearing was an "actual trial."

### Actual Trial

■ Emscor points out that the judge heard testimony from witnesses before giving his approval to the settlement. In support of its argument, Emscor cites *Gulf Ins. Co. v. Vela,* 361 S.W.2d 904 (Tex.App.—Austin 1962, writ ref'd n.r.e.) and *Pioneer Casualty Co. v. Jefferson,* 456 S.W.2d 410 (Tex.

App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.). In *Vela*, the plaintiff sought recovery against an insurance carrier who refused to defend or cover the defendant/insured in the underlying auto collision suit. 361 S.W.2d at 905. The Austin Court of Appeals held that there was an "actual trial" where a jury heard testimony from the plaintiff and the plaintiff's doctor in the underlying suit and the court rendered judgment for the plaintiff. *Id.* at 908. In *Jefferson*, this Court, on underlying facts similar to *Vela*, held there was an "actual trial" where the attorney for the insured appeared before the court and "admitted liability" and where, as in *Vela*, the judgment recited that the pleadings and sworn testimony had been heard by the court. 456 S.W.2d at 413.

Alliance contends there was no "actual trial" because the trial court did not hear evidence, made no findings, and did not determine liability or damages. Alliance is correct. Michael Weaver's widow, Kristina Weaver, and Emscor's President, Jim Jenson, testified at the November 12th hearing, according to the *Ketcher* plaintiffs' attorney, "to prove up the settlement" on behalf of the minor, Lyndsey Michelle Weaver. In actuality, the parties had already agreed before the hearing to the ad litem fees to be taxed against the other settling defendants and then agreed at the hearing to defer "other ad litem matters" with respect to Emscor, pending the outcome of the suit against Alliance.

Thus, the only "evidence" the trial court heard was the parties respective understanding of the agreement. Mrs. Weaver acknowledged that for consideration of the $3,000,000 settlement, she was foregoing the option of "going to trial against" Emscor and "obtaining a judgment that [she] may not collect." She also recognized that she was to give Emscor a covenant to postpone execution of the judgment until such time as attempts were made to collect funds from the Guaranty Fund and until Emscor prosecuted the suit against Alliance.

Mr. Jenson acknowledged the *Ketcher* plaintiffs' covenant to postpone execution of the judgment "until all efforts to recover funds from [Alliance] have failed." He also acknowledged that in exchange for the *Ketcher* plaintiffs' promise, Emscor would assign 75% of its cause of action and continue to engage in business. Finally, Mr. Jenson stated his belief that Emscor was not to blame for the accident "in any way" and that Emscor was taking this course of action as a prudent business decision. The Agreed Final Judgment itself recites that Emscor's agreement "to this judgment was not an admission of any liability, and was not to be construed as such, but that [Emscor] was compelled to agree to this judgment in an effort to limit its exposure ... without any admission of guilt."

The term "judgment following actual trial" contemplates "a contest of issues leading up to a final determination by court or jury in contrast to a resolving of the same issues by agreement of the parties, i.e., without a contest." *Wright v. Allstate Ins. Inc.*, 285 S.W.2d 376, 379–80 (Tex.App.—Dallas 1956, writ ref'd n.r.e.). There is no question that disposition of the *Ketcher* litigation was by "friendly suit" or consent judgment where, upon hearing, the only objective of the parties was to obtain the court's approval of their agreement and to memorialize that agreement as the judgment of the court. *See Gulf Ins. Co. v. Texas Casualty Ins. Co.*, 580 S.W.2d 645, 648 (Tex.App.—Fort Worth 1979, writ ref'd n.r.e.); *see also Wright*, 285 S.W.2d at 379. The November 12th hearing did not involve a "contest of issues" regarding liability, damages or any other matter. The trial court did not hear "evidence" or make findings related thereto, and the judgment contains no such recitals as described in *Vela* and *Jefferson*. The trial court did approve the parties' agreement on the record; however, had the court withheld its approval, the parties still would not have litigated the matters raised at the hearing. *See Gulf Ins. Co.*, 580 S.W.2d at 648.

Emscor asserts that Alliance cannot rely on the no-action clause under the exception set out in *Gulf Ins. Co. v. Parker Prods. Inc.* In that case, decided after *Vela* and *Jeffer-*

*son*, the Supreme Court held that an insurance company may ordinarily insist upon compliance with the no-action clause for its own protection, but the company may not do so after it is given the opportunity to defend the suit or to agree to settlement and refuses to do either on the *erroneous* ground that it has no responsibility under the policy. *Gulf Ins. Co.*, 498 S.W.2d at 679; *see also First Nat'l Indem. Co. v. Mercado*, 511 S.W.2d 354, 358 (Tex.App.—Austin 1974, no writ). [emphasis added]

This exception has only been applied to situations involving primary carriers who ordinarily have a contractual duty to defend when an occurrence falls within coverage provisions of the policy. *See, e.g., Gulf Ins. Co.*, 498 S.W.2d at 679; *Ranger Ins. Co. v. Robertson*, 707 S.W.2d 135, 143–44 (Tex. App.—Austin 1986, writ ref'd n.r.e.); *Theode v. International, Service Ins. Co.*, 600 S.W.2d 389, 391 (Tex.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *Young Men's Christian Assoc. v. Commercial Standard Ins. Co.*, 552 S.W.2d 497, 504 (Tex.App.—Fort Worth 1977), writ ref'd n.r.e., 563 S.W.2d 246 (Tex. 1978) (per curiam).; *Liberty Mut. Ins. Co. v. General Ins. Corp.*, 517 S.W.2d 791, 798 (Tex. App.—Tyler 1974, writ ref'd n.r.e.); *Mercado*, 511 S.W.2d 358.

However, this case concerns an excess carrier who had no contractual duty to defend. *Emscor, Inc.*, 804 S.W.2d at 199–98; *Harville v. Twin Fire Ins. Co.*, 885 F.2d 276, 279 (5th Cir.1989). Emscor points out that it does not complain that Alliance erroneously refused to defend Emscor in the *Ketcher* litigation, but only that Alliance wrongfully and erroneously refused to settle the case for the excess policy limits during the *Stowers* period. Alliance might have wrongfully refused settlement only if Emscor had satisfied one of the four conditions of coverage. As we stated, Emscor did not do so and, as is apparent from the record, had no intention of doing so.

### Failure To State A Stowers and Bad Faith Cause of Action

There is simply no authority in this State establishing a cause of action by an insured against its **excess** insurer for negligence, bad faith, or for unfair and deceptive practices in the handling of a claim brought by a third-party. The *Stowers* doctrine has been applied in Texas in only two circumstances—to the insured's right to sue a **primary** carrier for wrongful refusal to settle a claim within policy limits, *see G.A. Stowers Furniture Co. v. American Indem., Co.*, 15 S.W.2d 544, 547–48 (Tex.Comm'n App.1929, holding approved), and to an excess carrier's right to sue a primary carrier, under the theory of equitable subrogation, to protect the excess carrier from damages for a **primary** carrier's wrongful handling of a claim, *see American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 483 (Tex.1992). Neither of those circumstances are present in the instant case.

■ Under *Stowers*, the insurer's duty to the insured, extends to the full range of the agency relationship as **expressed in the policy**. *See Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 659 (Tex.1987). [emphasis added]. That duty may include investigation, preparation for defense of the lawsuit, trial of the case, and reasonable attempts to settle. *See American Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 849 (Tex.1994) (opinion on motion for rehearing). Here, Alliance had no duty to investigate, negotiate or defend Emscor under the terms of the excess policy or at law, and never undertook those responsibilities on its own. *See Emscor*, 804 S.W.2d at 197–99. Therefore, Alliance had no duty under *Stowers* and Emscor has failed to state a *Stowers* cause of action.

■ Similarly, Emscor has failed to state a cause of action for bad faith. No Texas court has applied the duty of good faith and fair dealing to an excess insurer. None of the federal cases applying Texas law, which are cited by the dissent, expressly recognizes a common-law duty of good faith and fair dealing on the part of an excess carrier to an insured. Those cases merely assume without deciding that such a duty exists. *Harbor Ins. Co. v. Urban Constr. Co.*, 990 F.2d 195, 202 (5th Cir.1993); *Beaumont Rice Mill, Inc.*

v. *Mid–American Indem. Ins. Co.*, 948 F.2d 950, 952 (5th Cir.1991); *McCracken v. U.S. Fire Ins. Co.*, 802 F.Supp. 30, 36 (W.D.Tex. 1992). Having no duty to "handle" the *Ketcher* plaintiffs' claim for Emscor, Alliance could not have breached a duty and Emscor therefore had no cause of action to assign to the *Ketcher* plaintiffs.[6] To subject Alliance to such potential liability, would be to forge a cause of action not previously recognized in this State. It is not for an intermediate appellate court to create new causes of action.

### No Recovery

Assuming Emscor has stated a cause of action, it has failed to establish recovery as a matter of law. Emscor asserts that Alliance is at least liable on the policy because there is now an agreed judgment. Again, Alliance was not a party to the agreed judgment nor was the agreed judgment rendered after a trial on the merits. In addition, the record shows that Alliance never refused to tender its policy limits; rather, it promised to do so, provided that Emscor paid the underlying limits in accordance with the insurance contract. More importantly, as we previously noted, there is nothing in the record to indicate that Emscor has ever paid the $500,000 underlying limit. Thus, Emscor is not entitled to recover as a matter of law on its breach of contract cause of action.

▉▉▉▉ Likewise, Emscor cannot recover on its bad faith or *Stowers* claim. Texas law recognizes the duty of an insurer to deal fairly and in good faith with its insured in the processing and payment of claims and, when assuming the insured's defense, to act as an ordinary prudent person would act in the management of his or her own business affairs. *Arnold v. Nat'l County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987); *Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 659 (Tex.1987) (citing *Stowers*, 15 S.W.2d at 547). To recover for breach of the duty of good faith and fair dealing, a plaintiff must prove: (1) the absence of a reasonable basis for denying or delaying payment of policy benefits; and (2) that the insurer knew or should have known that there was no reasonable basis for denying or delaying payment. *See National Union Fire Ins. Co. v. Dominguez*, 873 S.W.2d 373 (1994) (citing *Aranda v. Insurance Co. of North Am.*, 748 S.W.2d 210, 212–13 (Tex.1988)). However, an insurer maintains the right to deny invalid or questionable claims and is not subject to liability for an erroneous denial of a claim. *See Lyons v. Millers Casualty Ins. Co. of Texas*, 866 S.W.2d 597, 600 (citing *Aranda*, 748 S.W.2d at 213). Whether there is a reasonable basis for denial is judged by the facts before the insurer at the time the claim is denied. *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex.1990).

If the conditions of coverage are truly ambiguous, i.e., susceptible of more than one **reasonable** interpretation, as Emscor suggests, then Alliance's denial of coverage based on its interpretation of the policy terms cannot be anything but reasonable. *See McCracken*, 802 F.Supp. at 36–37. Indeed, the Texas Supreme Court has recently held that evidence that merely shows a bona

---

6. Even if Emscor had such a cause of action, Emscor was expressly prohibited from assigning it to the *Ketcher* plaintiffs. Condition 11 of the Policy forbids an "assignment of interest under [the] policy" without Alliance's consent. Further, the *Ketcher* plaintiffs were without standing to bring the type of claims asserted. *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 149–50 (Tex. 1994) (opinion on motion for rehearing); *Wheelways Ins. Co. v. Hodges*, 872 S.W.2d 776, No. 06–93–00044–CV, slip op. at 11 (Tex.App.—Texarkana 1994, n.w.h.); *Charter Roofing v. Tri-State Ins.*, 841 S.W.2d 903, 905–6 (Tex.App.—Houston [14th Dist.] 1992, no writ); *CNA Ins. Co. v.* *Scheffey*, 828 S.W.2d 785, 791–92 (Tex.App.—Texarkana 1992, writ denied); *Bowman v. Charter General Agency Co.*, 799 S.W.2d 377 (Tex. App.—Corpus Christi 1990, writ denied); *Caserotti v. State Farm Ins.*, 791 S.W.2d 561, 566 (Tex.App.—Dallas 1990, writ denied); *Chaffin v. Transamerica Ins. Co.*, 731 S.W.2d 728, 731–32 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (and cases cited therein); *see also Cowley v. Texas Snubbing Control*, 812 F.Supp. 1437, 1444–50 (S.D.Miss.1992). As judgment creditors, the *Ketcher* plaintiffs could only bring suit on the Policy, provided that there was compliance with the no-action clause. As we described, there was no such compliance.

fide dispute about the liability on the insurance contract does not rise to the level of bad faith. *Transportation Ins. Co. v. Moriel*, 37 Tex.Sup.Ct.J. 450, 455, (February 2, 1994); *see Lyons*, 866 S.W.2d at 601. Nor is bad faith established when the trier of fact, with the benefit of hindsight, decides the insurer was simply wrong about the factual basis for its denial of the claim or **about the proper construction of the policy.** *See Moriel*, 37 Tex.Sup.Ct.J. at 455. [emphasis added]

■ "The issue of bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim." *Lyons*, 866 S.W.2d at 601. The summary judgment proof establishes that there was, at most, a "bona fide controversy" about whether Emscor satisfied the conditions of coverage. *See St. Paul's Ins. v. Fong Chun Huang*, 808 S.W.2d 524, 526 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *see also Beaumont Rice Mill*, 948 F.2d at 952. Because a dispute about coverage does not as a matter law rise to the level of bad faith or connote such a lack of ordinary care so as to give rise to an action in negligence under *Stowers*, the summary judgment in favor of Alliance on those causes of action was proper. *See id.*[7]

■ Lastly, summary judgment on Emscor's Insurance Code and DTPA claims was proper. Emscor alleged in its pleadings that Alliance "made representations to [Emscor] in order to induce [Emscor] to purchase the Policy" and that "the falsity of these representations came to light when [Emscor] discovered ... that Alliance refused to provide [Emscor] with coverage and [refused] to settle the underlying [*Ketcher* ] litigation." The summary judgment proof does not reveal the precise nature of Alliance's alleged misrepresentations. Assuming that Emscor's allegations are true, however, its claims are barred by limitations.

An action under article 21.21 of the Insurance Code and under the DTPA must be commenced within two years after the deceptive act or practice or within two years after the plaintiff discovered, or in the exercise of reasonable diligence, should have discovered the deceptive act or practice. Tex.Ins.Code Ann. art. 21.21 § 16(d) (Vernon Supp.1994); Tex.Bus. & Com.Code Ann. § 17.565 (Vernon 1987). Emscor purchased the Policy in 1987, but asserts that it did not learn of Alliance's alleged misrepresentations until Alliance "refused to provide coverage and refused to settle." Emscor does not say exactly when that occurred. The summary judgment proof shows that on September 23, 1988, Emscor was notified by Alliance that Alliance's excess policy would not "drop down to pick up the coverage that the primary carrier provided." Emscor filed suit on May 9, 1991, more than two years after Emscor discovered that the Alliance excess policy did not provide coverage. Thus, Emscor's DTPA and Insurance Code claims are barred.

■ Even if limitations do not preclude those claims, Emscor is still not entitled to recovery. Breach of the *Stowers* duty alone does not constitute a violation of article 21.21 or the DTPA. *Garcia*, 876 S.W.2d at 847. There is nothing in the record that shows that Alliance ever misrepresented its duties and obligations under the policy or that Alliance otherwise engaged in unfair or deceptive acts or practices as defined by article 21.21 of the Insurance Code and section 17.46 of the DTPA. Tex.Ins.Code Ann. art. 21.21 §§ 4, 16 (Vernon Supp.1994); Tex.Bus. &

---

7. As Alliance points out, any potential *Stowers* cause of action against Alliance entails scrutiny of Emscor's conduct during settlement negotiations. *See Warren*, 826 S.W.2d at 188 (and cases cited therein). Alliance's uncontroverted summary judgment proof shows that Emscor's conduct during negotiations was, at best, suspect. The Agreed Final Judgment was three times greater than the *Ketcher* plaintiffs' *Stowers* demand. On the date that demand was to expire, Emscor could have responded with a $600,000 counter-offer, i.e. $100,000 from Alliance and $500,000 from Emscor or the Guaranty Fund. There is nothing in the record to indicate that Emscor made such an offer or that Emscor attempted to keep Alliance abreast of the status of settlement negotiations.

Com.Code Ann. § 17.46 (Vernon 1987). Hence, Emscor could not recover on these claims.

## Conclusion

It is obvious from Emscor's communications with Alliance and the Guaranty Fund and from its negotiations with the *Ketcher* plaintiffs that Emscor was financially unable to pay the first $500,000 of primary coverage. Indeed, the summary judgment proof reflects that Emscor had no intention of paying the underlying limits. Rather, Emscor tried to get the Guaranty Fund to pay the first $500,-000. Emscor never obtained the Guaranty Fund's commitment and even if it had, the Fund could not have paid the entire $500,000. Nor did Emscor ever actually pay or unconditionally promise to pay the first $500,000. When these efforts failed, Emscor attempted circumvent the actual payment provision of the policy by asserting at the "last minute" that it had satisfied the policy conditions as "modified" and, finally, by executing the Agreed Final Judgment which never obligated it to pay the underlying limits. Yet, throughout these sequence of events, Emscor continued to insist that Alliance tender its excess policy limits. Had Alliance done so without assurance that Emscor would ever pay the underlying limits, it would have been left in the position of the primary insurer, contrary to the express terms of the excess policy and contrary to the laws of this State. Placing such a burden on the excess carrier would defeat the very purpose of excess liability insurance and make such coverage more expensive and inaccessible. *See Emscor, Inc.*, 804 S.W.2d at 198 (quoting *Harville v. Twin City Ins. Co.*, 885 F.2d 276, 279 (5th Cir.1989)).

In *Laster v. American Nat'l Fire Ins. Co.*, 775 F.Supp. 985 (N.D.Tex.1991), *aff'd*, 966 F.2d 676 (5th Cir.1992), a case with strikingly similar facts, the court held that summary judgment in favor of an excess carrier on causes of action brought by a personal injury plaintiff as assignee of the insured was proper where the insured had not paid the underlying policy limit and where the insured's defense of the underlying personal injury claim was in disregard of the excess insurer's rights. 775 F.Supp. at 992–1000. The court warned of the injustice which now confronts Alliance:

> The requirement that such payment be made by the insured before [the excess insurer] can become liable is an acceptable and reasonable condition precedent. It has as its objective the prevention of an arrangement by which the insured would seek to cause liability to be imposed on the insurance company for an amount in excess of the retained limit without first experiencing any financial detriment himself.

> \* \* \* \* \* \*

> If the policy did not contain such a condition, [the insurer] could be subjected to fraudulent and collusive transactions of a kind to which an excess insurer becomes particularly vulnerable when the primary insurer refuses, or is unable, to perform its obligation to protect the insured by providing him an appropriate investigation and defense related to claims arising from a covered occurrence.... [The excess insurer] had no duty to defend [the insured] in the damage suit though it had the option to do so. If an excess carrier elects not to provide a defense, and if the primary carrier fails or refuses to defend the insured, there is the temptation on the part of the insured to join with the injured party in a collusive arrangement that would give the insured immunity from any financial exposure while at the same time providing the injured party an opportunity to seek collection under the excess insurance policy. When there is a requirement, such as the one contained in the [excess insurer's] policy, that the excess insurer cannot be liable unless the insured has first made a significant payment of his own, the risk that the insured and the injured will take unfair advantage of the excess insurer is greatly reduced.

775 F.Supp. at 993; *see also State Farm Fire & Cas. Co. v. Gandy*, 880 S.W.2d 129, 138 (Tex.App.—Texarkana 1994, writ pending) (observing that an agreed judgment executed

contemporaneously with a covenant not to execute violates public policy because it perpetrates a fraud on the court).

Because Emscor failed to satisfy the conditions of the Alliance policy and failed to state a cause of action, summary judgment in favor of Alliance on Emscor's contractual and extra-contractual causes action was proper. Accordingly, we overrule Emscor's points of error and affirm the judgment of the trial court.

SEARS, Justice, dissenting.

Perhaps the most significant observation that illustrates the inequity embraced by the majority opinion is in the letter dated October 25, 1990, from Emscor attorneys to Alliance attorneys:

> ... It is certainly not Emscor's fault that its primary insurance company has become insolvent. There is also no doubt that had the primary insurance company *not* become insolvent this case would have been settled by now with the full $500,000.00 primary being paid, along with the full $500,000.00 excess coverage with Alliance whom you represent. It would be grossly unfair to allow Alliance the windfall of not having to pay its $500,000.00 excess coverage simply because of the historical accident of Emscor's primary insurance carrier becoming insolvent....

I concur in the foregoing and respectfully dissent from the majority opinion. I would reverse the summary judgment because Emscor satisfied the express conditions of the Alliance policy during the *Stowers* period. Alternatively, I would hold that there is a fact question as to whether Alliance modified or waived the conditions of the policy during the *Stowers* period and, therefore, under the doctrines of waiver or estoppel, could not require Emscor to comply with those conditions.

Initially, Alliance contends that the first three conditions that could trigger the excess coverage could only be satisfied by the un-derlying insurer, Stone Mountain, or its receiver, the Texas Guaranty Fund. The Policy reads that:

(1) The underlying insurers have paid the full amount of their respective loss liability;

(2) the underlying insurers have been held to pay the full amount of their respective loss liability;

(3) the underlying insurers shall have admitted liability for the underlying limits; and

(4) the insured has by final judgment been adjudged to pay a sum which exceeds such underlying limits.

Alliance's interpretation that *only* Stone Mountain can satisfy those conditions is unreasonable. In other words, under Alliance's interpretation, only condition (4) could have triggered coverage under the policy once Stone Mountain became insolvent, because condition (4) was the only condition that omitted a reference to compliance by the "underlying insurer". Such a construction of the policy favors exclusion of coverage and is unreasonable. *See National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991).

Consistent with the rule that ambiguities and inconsistencies in insurance contracts are to be strictly construed in favor of coverage, I would hold that Emscor could "step into the shoes" of the underlying insurer for the purpose of satisfying the policy conditions. *See id.; see also Stonewall Ins. Co. v. Modern Exploration, Inc.*, 757 S.W.2d 432, 434–35 (Tex.App.—Dallas 1988, no writ) (holding that third-party beneficiary of an excess policy could step into the shoes of the insured in order to satisfy conditions of a policy where excess insurer provided defense upon a reservation of rights). This interpretation is consistent with Alliance's September 23, 1988, letter acknowledging that "Emscor would be responsible for the primary level of coverage."

Because Emscor could properly step into the shoes of its primary carrier, Stone Moun-

tain, the question becomes whether *Emscor* satisfied the conditions of the Alliance policy during the *Stowers* period. As the majority correctly observes, Emscor did not comply with conditions (1) and (4) during the *Stowers* period. Emscor had not actually paid the underlying limits as of the November 12th hearing, and the Agreed Final Judgment resulting from that hearing was not rendered until seven days after the *Stowers* period had expired. However, Emscor only had to comply with 1 of the 4 conditions in order to trigger the excess coverage.

### Condition 2—Held To Pay

The majority opinion takes the position that "held to pay" is only satisfied when Emscor is held liable to pay by "judgment". However, the cases cited by the majority opinion clearly show that compliance with the contract requirement that the insured be "held to pay" may be satisfied by "settlement agreement". In the three cases cited by the majority opinion to uphold this position, the majority misstates the holdings of those cases, as will be shown below.

*Case No. 1: Hudson Insurance Co. v. Gelman Sciences, Inc.,* 921 F.2d 92 (7th Cir. 1990).

Hudson issued a $4,000,000 excess insurance policy to Gelman, to cover Gelman's liability between $21,000,000 and $25,000,000. Mission Insurance Company covered liability from $2,000,000 to $21,000,000. When an incident occurred for which Gelman's liability was $1,000,000 over its primary policy, the primary carrier paid. Mission was insolvent, and Gelman demanded that Hudson "drop down" and cover the excess $1,000,000. The 7th Circuit held that Hudson was not required to "drop down." Contrary to this majority opinion, the 7th Circuit *did not define or interpret the term "held to pay" or "held liable to pay"*. The 7th Circuit only held that the phrase in the policy, "held liable to pay", did not require Hudson to "drop down" into the shoes of the insolvent carrier. The Hudson case is inapposite to the appeal before this court, because Emscor did not

request Alliance to "drop down" into the shoes of the insolvent carrier. Instead, *Emscor* stepped into the shoes of the insolvent carrier, executed a settlement agreement, and agreed to pay the primary coverage of $500,000. Emscor then demanded that Alliance, as *excess* carrier, pay its excess coverage of $500,000.

*Case No. 2: Highlands Insurance Co. v. Gerber Products Co.,* 702 F.Supp. 109 (D.Maryland 1988).

Gerber carried primary insurance with Liberty Mutual, first-level excess with Mission National, and second-level excess with Highlands, AIU, American and Federal. Gerber settled a lawsuit for one million dollars in excess of its primary coverage. The second level excess carrier, Mission National, was bankrupt. Gerber then sought to have Highlands, AIU, American and Federal "drop down" and provide *first level excess coverage*. Like the Emscor policy, the Highlands policy had language providing that Highlands would not become liable until the underlying carriers had paid or had been "held liable to pay." The majority opinion indicates that the Maryland Court holding was that the phrase, "held liable to pay" meant that the insured be held liable to pay by "judgment or a settlement." However, that was not the holding of the Court. The Maryland District Court held that the phrase "held liable to pay" was *"merely an acknowledgment that attachment of [the excess carriers] liability need not wait for actual payment of the underlying amount."* The Court then *correctly* held that Highlands did not have to "drop down." However, it is significant to this appeal that the Maryland court held that the triggering of the excess carrier liability "need not wait" for actual payment of the primary coverage.

*Case No. 3: Vickodil v. Lexington Insurance Co.,* 412 Mass. 132, 587 N.E.2d 777 (1992).

Vickodil was a plaintiff in a lawsuit against Amrak and received a judgment of $1,473,-934.10. Amrak's primary carrier Aetna, provided coverage up to $100,000.00. Amrak's

first-level excess carrier, Northeastern, provided coverage between $100,000.01 and $999,999.99, and Amrak's second-level excess carrier, Lexington, provided coverage starting at $1,000,000.00. Aetna paid the full limits of their primary liability, $100,000.00. Northeastern was bankrupt, and the Guaranty Fund paid $299,000 to Vickodil on behalf of the first-level excess carrier. Lexington then paid $473,934.10, which was the amount in excess of a million dollars. Vickodil sued Lexington for the remaining $601,000.00, claiming that Lexington had an obligation to "drop down" and pay that amount which Northeastern could not pay. Lexington's insurance contract also contained the language "had paid or had been held liable to pay." *That court determined that "held liable to pay" meant that the insured had been "held liable to pay the plaintiff."* Again, the majority opinion is incorrect in stating that the court held the phrase "held liable to pay" means that they be held to pay by a judgment. The court simply found that the insured, *under the facts of this case,* had been held liable to pay because a judgment had been rendered. However, the majority fails to point out that the court determined that "held to pay" meant *"held liable to pay the plaintiff."* Clearly, by the settlement agreement which will be discussed later in the opinion, Emscor was "held liable to pay the plaintiff" during the *Stowers* period.

While the majority opinion clearly states that all three of the foregoing cases hold that "held to pay" requires that a "judgment" be rendered prior to triggering the liability of an excess carrier, that is not the law, and was not the law as stated in those opinions. While there is no Texas law that defines "held to pay", or "held liable to pay," all of the caselaw which I can find from our sister states clearly *do not* require that a judgment be rendered in order to satisfy the "held to pay" provision of an excess carrier's insurance policy. The majority opinion appears to confuse this appeal with "drop down" case. This *is not* a "drop down" case. This *is* a case where the excess carrier refused to pay the excess coverage *after* the insured stepped

into the shoes of the bankrupt primary carrier, executed a settlement agreement, and held itself liable to pay the full limits of the primary policy.

I have found a case that is remarkably similar to some important aspects of this appeal. *United States Fid. and Guaranty Co. v. Safeco Ins.,* 555 S.W.2d 848 (Missouri App.1977). Although *Safeco* is a complex case, involving the payment of interest accumulated while the insurance companies litigated their respective liabilities, it involves an additional question that we are faced with in this appeal: can *settlement* between the insured and the plaintiffs of the primary policy limits trigger the obligation of excess carriers to pay? Safeco, like Alliance, maintains that excess carriers have no liability until the primary carrier has discharged its responsibility by "paying the full policy limit." Also, like Alliance, Safeco contends that payment, not settlement, discharges a primary carriers liability and triggers the excess coverage. However, the enlightened Supreme Court of Missouri held that the primary carriers "liability was exhausted by the *settlement* with the [plaintiffs], and Safeco's liability as the excess carrier arose." (emphasis added).

Also of particular interest in the Safeco case is that the plaintiffs *settled* with the insured because the primary carrier was insolvent. In the terms of the settlement, the plaintiffs agreed not to pursue the insured's personal assets to satisfy any judgments they might recover, but instead agree to seek relief only from the solvent excess carriers involved. In exchange for that concession, the insured *admitted liability.*

Emscor is in a much better position than the insured in Safeco in that Emscor has: (1) settled, (2) admitted liability, and (3) held itself to pay the *full* amount of the primary coverage. The Safeco court cited an earlier case and held "while emphasizing that exhaustion of the primary insurance was a necessary condition precedent to liability under the excess policy, such condition is complied with when the insured proves that the claims

aggregating the full amount of the specific policy had been settled thereunder and full liability of the insurer discharged." *Handleman v. U.S.F. & G. Co.,* 223 Mo.App. 758, 18 S.W.2d 532 (1929). (emphasis added).

### Settlement Agreement/Guaranty Letter

The majority holds that the guaranty letter was not definite or binding, because it did not specify a deadline for the *Ketcher* plaintiffs to undertake efforts to collect the full $500,000 from the guaranty fund or to tender a demand to Emscor. However, as the above cases show, there is no requirement that the plaintiffs collect in full from the insured on the underlying policies. There is only a requirement that they enter into a settlement agreement which they accept as *satisfaction* of the coverage due under the primary policy.

The terms of the letter of guaranty are as follows: "for good and valuable consideration, the receipt of which is hereby acknowledged and confessed and in further consideration of the *compromise and settlement of the subject litigation,* guarantors agreed to the following terms:"

> 3(a) Guarantors will pay beneficiaries the difference, up to five-hundred thousand dollars ($500,000), between the amount of money the Texas state board of insurance guaranty fund approves for payment as the result of claims filed with the guaranty fund in the subject litigation, and the total sum of five-hundred thousand dollars ($500,000).

> (b) Before guarantors are obligated to pay beneficiaries anything, beneficiaries are obligated to exhaust all efforts and remedies to collect up to five-hundred thousand dollars ($500,000) from the state board of insurance guaranty fund.

> (c) After beneficiaries have exhausted all efforts and remedies stated in paragraph 3(b) then guarantors shall immediately become obligated upon thirty

(30) days written demand of beneficiaries to pay the amount due following the directives of paragraph 3(a) above.

> (d) Guarantors obligations to beneficiaries are irrevocable and unconditional.

Further, paragraph 4 shows that as security to the beneficiaries, Emscor "hereby grants to beneficiaries a security interest in and to all assets and properties of Emscor, Inc. and Emscor, Inc. agrees to execute and cause to be filed financing statements to perfect such security interests."

In spite of all of Emscor's attempts to comply with the policy conditions, as they existed and as they were modified, and to convince Alliance to settle the Ketcher plaintiffs' excess claims, Alliance defiantly refused.

### Condition 3—Admitted Liability

Emscor contends that it "admitted liability" for the underlying limits of the primary coverage and thereby satisfied condition 3. For the majority opinion to ignore the satisfaction of condition 3, the majority must believe that only Stone Mountain and not Emscor could be responsible for the primary coverage. However, Alliance specifically told Emscor that Emscor would be responsible for its own primary coverage as a result of the underlying insurers insolvency. Further, in an attempt to fulfill that responsibility, and in accordance to Alliance's instructions and modified conditions, Emscor executed the letter of guaranty. The letter of guaranty satisfies all of plaintiffs' claims against Emscor and is an admission of liability.

### Condition 5

Condition 5 of the policy states as follows:

Attachment of Liability—Liability under this policy shall not attach unless and until the *underlying insurers shall have admitted liability for the underlying limits* or unless and until the insured has by final judgment been adjudged to pay a sum which exceeds such underlying limits. (emphasis added).

The majority opinion interprets the underlined portion of Condition 5 to mean that "the underlying insurers have *paid the full amount* of their respective loss liability." (emphasis added). Further, by footnote 5, the majority disputes that Emscor can "step into the shoes of the underlying insurer." This interpretation that the insurer must "pay the full amount" is clearly erroneous and is simply *not a requirement* of Condition 5. The majority belief that *payment in full* is required is not supported by any part of the excess insurance policy issued by Alliance to Emscor.

Clearly, Emscor *can* step into the shoes of the bankrupt primary carrier, and clearly Emscor "admitted liability for the underlying limits." Therefore, summary judgment for Alliance was error.

### Modification/Waiver/Estoppel

Even if it can be said that Emscor failed to comply with the express conditions of the policy, a material fact question exists as to whether Alliance modified the express conditions and was prohibited by the doctrines of waiver or estoppel from demanding strict compliance with those conditions. *See Employers Casualty Co. v. Tilley,* 496 S.W.2d 552, 561 (Tex.1973); *see also State Farm Lloyds, Inc. v. Williams,* 791 S.W.2d 542, 552 (Tex.App.—Dallas 1990, writ denied). Although the terms are often used interchangeably, "waiver" and "estoppel" are two distinct doctrines. *Id.* at 552. "Waiver" requires the voluntary and intentional relinquishment of a known, existing right, or intentional conduct inconsistent with claiming that right. *Id.* citing *Utilities Ins. Co. v. Montgomery,* 134 Tex. 640, 138 S.W.2d 1062, 1064 (Tex. Comm'n App.1940, opinion adopted); *Swiderski v. Prudential Property & Cas. Ins.,* 672 S.W.2d 264, 268 (Tex.App.—Corpus Christi 1984, writ dism'd) (and cases cited therein).

"Estoppel," on the other hand, arises "where by fault of one, another has been induced to change his position for the worse." *Id.* at 268 (citations omitted); *see Stonewall Ins.,* 757 S.W.2d at 436. In the insurance context, it ordinarily requires a showing that the insured was prejudiced by the conduct of the insurer. *Williams,* 791 S.W.2d at 552 (citing *Tilley,* 496 S.W.2d at 560). Assuming that Alliance's summary judgment proof established Emscor's non-compliance with the conditions of the policy, the burden was on Emscor, the non-movant, to adduce evidence of waiver or estoppel which was sufficient to raise a fact issue necessary to defeat summary judgment. *See Swiderski,* 672 S.W.2d at 268.

The October 24th and 26th letters written by Alliance were attached to Emscor's response to the Alliance's motion for summary judgment. Those letters show that when Emscor was trying desperately to avoid excess liability that would destroy the company, Alliance told Emscor that it could trigger Alliance's coverage by "arranging to pay" or "agreeing to pay" the first $500,000. In other words, Alliance told Emscor it could satisfy the "pay" or be "held to pay" condition if Emscor would "arrange to pay" or "agree to pay." After Emscor subsequently executed the Letter of Guaranty, Alliance rejected the guaranty and denied coverage, thereby exposing Emscor to liability in excess of its ability to pay. Emscor certainly changed its position for the worse based on Alliance's offer to modify the conditions by complying with Alliance's definition of the condition.

Performance of a condition precedent can be modified by word or deed by the party to whom the obligation was due. *Ames v. Great Southern Bank,* 672 S.W.2d 447, 449 (Tex. 1984). Clearly, a material fact question exists as to whether Alliance, by word or deed, changed the conditions of the policy to Emscor's detriment and, therefore, waived reliance, or was estopped from relying on Emscor's strict compliance with the express conditions of the policy.

Alliance and the majority maintain that the doctrines of waiver and estoppel cannot be used to create insurance coverage where none exists by the terms of the policy. *Texas Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 602–3 (Tex.1988) (opinion on rehearing).

"In other words, waiver and estoppel cannot create a new and different contract with respect to risks covered by the policy." *Id.* (quoting *Great Am. Reserve Ins. Co. v. Mitchell,* 335 S.W.2d 707 (Tex.App.—San Antonio 1960, writ ref'd)). Here, there was no dispute that the risks covered by the Alliance policy included the personal injury claims that were asserted against Emscor in the underlying litigation. Because there was no dispute about the risks covered by the policy, but only about *when* coverage was triggered, *Texas Farmers* is inapplicable.

### The "No–Action" Clause

Notwithstanding the fact issue regarding Emscor's compliance with the express or modified condition of the policy, the majority points out that this suit is barred by the no-action clause. According to the majority, Emscor's obligation to pay was never determined by judgment "after actual trial", or by written agreement, to which Alliance was a party. However, even if that were true, there is still the question of whether Alliance was entitled to rely on the no-action clause under the exception recognized in *Gulf Ins. Co. v. Parker Products Inc.,* 498 S.W.2d 676 (Tex.1973). As the majority observes, the Texas Supreme Court held in *Gulf Ins.* that an insurance company may ordinarily insist upon compliance with a no-action clause except where it was given the opportunity to defend a suit, or to agree to a settlement, and refused to do either on the **erroneous** ground that it had no responsibility under the policy. *Id.* at 679. Whether Alliance's refusal to agree to settle was erroneous is the precise fact question that a jury must decide.

### Stowers Doctrine

The majority, citing *Ranger County Mutual Ins. Co. v. Guin,* 723 S.W.2d 656, 659 (Tex.1987), held that Alliance owes no duty to Emscor because Alliance was not required by the **terms** of the policy to assume control of the investigation, negotiation, or defense of the claim by the *Ketcher* plaintiffs. *Guin* in

no way stands for the proposition that a policy **must** contain such terms to enable the insurer to be "Stowerized." In fact, in *American Physicians Ins. Exchange v. Garcia* 876 S.W.2d 842, 848–49 (1992) (opinion on motion for rehearing), cited by the majority, the Texas Supreme Court, citing *Guin,* stated without reservation that the insurer's duty of ordinary care under *Stowers* includes investigation, preparation for defense of the lawsuit, trial of the case, and **reasonable attempts to settle.** More importantly, the court suggested that this duty might extend to "excess insurers". *Id.* at 855 n. 25. In any event, Alliance thoroughly involved itself in the investigation and settlement of the *Ketcher* suit before refusing the settlement offer proposed by the *Ketcher* plaintiffs and recommended by Emscor.

As for the reasonableness of the $3,000,000 settlement, Alliance and the majority assert that Emscor failed to take reasonable steps to minimize Alliance's legal liability primarily because the settlement was three times greater than the original demand. Neither Alliance nor the majority cite any authority for the proposition that the amount of the judgment alone is sufficient to establish that a settlement was *per se* unreasonable. Contrary to the majority's assertion, there is nothing in Alliance's summary judgment proof which undermines the "reasonableness" of the settlement. At the very least, there is a *question of fact* as to the reasonableness of the settlement.

### Breach Of The Duty Of Good Faith And Fair Dealing

The majority, citing a host of cases, holds that Emscor cannot assert a bad faith claim because Texas law does not recognize a cause of action by an insured against its insurer for bad faith in the handling of a third-party claim. In one of those cases, *Charter Roofing Co. v. Tri–State Ins. Co.,* 841 S.W.2d 903, 905–6 (Tex.App.—Houston [14th Dist.] 1992, no writ), the insured brought a bad faith suit against its insurer for denying a third party's claim. This court observed that there was no authority to support such a claim but did

not expressly rule out such a claim, and in fact proceeded to review whether the insurer *had* acted in bad faith. 841 S.W.2d at 905–6. Here, Emscor presents an entirely cognizable cause of action. *See, e.g., Harbor Ins. Co. v. Urban Constr. Co.,* 990 F.2d 195, 202 (5th Cir.1993); *Beaumont Rice Mill, Inc. v. Mid American Indem. Ins. Co.,* 948 F.2d 950, 952 (5th Cir.1991); *McCracken v. U.S. Fire Ins. Co.,* 802 F.Supp. 30, 36 (W.D.Tx 1992) (recognizing that excess carrier may have duty of good faith and fair dealing).

In direct compliance with Alliance's instructions, Emscor "held" itself to pay the underlying limits by the Letter of Guaranty. After Alliance subsequently refused to tender its policy limits, a judgment was rendered against Emscor in excess of both its primary and excess coverage. Emscor is entitled to have a jury determine whether that excess judgment resulted from Alliance's bad faith or negligence.

Finally, although not addressed by the majority, Alliance contends that Emscor's cause of action for breach of the duty of good faith and fair dealing is barred by limitations. The statute of limitations governing a cause of action for breach of the duty of good faith and fair dealing is "two years after the day the cause of action accrues." TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(a) (Vernon 1986). A bad faith cause of action ordinarily accrues when an insurer fails to pay an insured under the policy; in other words, when there is a denial of coverage. *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 829 (Tex.1990).

Alliance asserts that limitations accrued when Emscor learned on September 23, 1988, that Alliance would not provide *primary* coverage as a result of Stone Mountain's insolvency. Emscor did not file this suit until May 9, 1991. However, Alliance's denial of primary coverage is irrelevant for purposes of this lawsuit because Emscor was seeking to invoke *excess* coverage, not primary coverage. Thus, the significant event in determining when the limitations period accrued is Alliance's denial of excess coverage, which occurred November 5, 1990, when

Alliance rejected the Letter of Guaranty. Suit was filed only six months later and well within the limitations period. Therefore, Emscor's bad faith claim is not barred by limitations.

## Violations Of The Insurance Code and DTPA

Alliance also contends and, the majority agrees, that the Emscor's DTPA and Insurance Code claims are barred by limitations and that the *Ketcher* plaintiffs lack standing under those statutes. TEX.BUS. & COM.CODE ANN. §§ 17.45(4), 17.565 (Vernon 1987); TEX. INS.CODE ANN. art. 21.21 § 16(a), (d) (Vernon Supp.1994). These contentions are also without merit. As the majority notes, Emscor claimed that it learned of misrepresentations made by Alliance with respect to coverage when Alliance refused to provide coverage and to settle the *Ketcher* suit. As we previously stated, the limitations period did not accrue until Emscor learned of Alliance's refusal to provide its *excess* coverage. That occurred sometime after the beginning of settlement negotiations in March 1990, which was fourteen months before suit was filed. Thus, Emscor's DTPA and Insurance Code claims are not barred by limitations.

I am aware of the Texas Supreme Court's recent opinion in *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145 (Tex.1994) (opinion on motion for rehearing), holding that a third-party has no standing under article 21.21 to sue an insurer directly for unfair settlement practices. However, the court in *Watson* was concerned with the potential conflict that could exist if an insurer owed a duty to deal in good faith with its insured as well as an injured third-party. 876 S.W.2d at 150. No such conflict exists here. The plaintiff in *Watson* was a **third-party claimant,** with whom the insurer had no contractual duty. The *Ketcher* plaintiffs are not third-party claimants *per se,* but are assignees of the contractual rights of Emscor. *See e.g. Garcia,* 876 S.W.2d at 871–72. (Justice Hightower dissenting). As Emscor's assignees, the *Ketcher* plaintiffs can enforce the obligations and duties that Alliance owed to Emscor

under the excess coverage policy. The *Ketcher* plaintiffs' covenant to postpone execution on the judgment in return for Emscor's assignment of its negligence and bad faith claims against Alliance, entitled the *Ketcher* plaintiffs to more than just recovery on the policy; it allowed them recovery on the *entire excess judgment. Id.*

As we noted earlier, plaintiffs may settle their lawsuit against an insured for the primary coverage, and take an assignment of the insured's cause of action against an excess carrier for its refusal to pay. *Safeco,* 555 S.W.2d at 854. Emscor purchased or acquired insurance services from Alliance and claimed that Alliance engaged in unfair settlement practices and deceptive acts during the sale of the policy. *See Garcia,* 876 S.W.2d at 847 (breach of the *Stowers* duty alone does not constitute a violation of the Insurance Code or of the DTPA); *see also Allstate Ins. v. Kelly,* 680 S.W.2d 595, 603 n. 4 (Tex.App.—Tyler 1984, writ ref'd n.r.e.). Because Emscor has standing under the Insurance Code, and is a consumer under the DTPA, the same is true for it's assignees, the *Ketcher* plaintiffs.

### Good Faith & Fair Dealing

The duty of "good faith and fair dealing" exists because of a special relationship between the insurer and the insured. It does not emanate from specific terms of the insurance contract. Further, it exists because of the unequal bargaining power between the two parties, and the tendency for that imbalance to encourage the strong to take advantage of the weak. See *Arnold v. National County Mutual Fire Insurance Co.,* 725 S.W.2d 165 (Tex.1987). The duty also exists because of that "special relationship", created by the imbalance, which gives insurers the power and *exclusive* control over "evaluation, processing, and denial of claims." *Id.* at 167. Because of the imbalance of power, and the special relationship existing between insurer and insured, a breach of the duty of good faith and faith dealing gives rise to a cause of action for *tort damages,* rather than simple liability for breach of contract.

I cannot conceive of a more deserving situation to apply the duty of good faith and fair dealing, than the present appeal. There is no good reason at law or in equity to deny an insured protection from abuse of the imbalance of power by an excess insurance carrier.

I would hold that Emscor has satisfied the requirement of "held to pay" as a matter of law, have executed a *settlement agreement* with the plaintiffs, and that they have admitted liability. Upon the occurrence of any one of the foregoing, Alliance was obligated to provide its excess coverage. In the alternative, there is at least a fact question as to whether the foregoing occurred and if so whether they triggered the requirement for Alliance to provide the excess coverage.

There is also material question of fact as to whether Alliance defined or modified the express conditions of the policy and, therefore, waived the necessity of compliance with those conditions, or is estopped from demanding compliance.

In conclusion, summary judgment in favor of Alliance was error. Accordingly, all of Emscor's points of error should be sustained, the trial court's judgment should be reversed, and this case should be remanded to the trial court for proceedings consistent with this opinion.