**NORTH AMERICAN CAPACITY INSURANCE COMPANY,** Plaintiff,

v.

**COLONY SPECIALTY INSURANCE COMPANY,** Defendant.

CIVIL ACTION NO. H–16–3371

United States District Court, S.D. Texas, Houston Division.

Signed 08/07/2017

Mariah Baker Quiroz, Ellen Lewis Van Meir, Thompson Coe et al., Dallas, TX, for Plaintiff.

John Charles Tollefson, Stephen A. Melendi, Tollefson Bradley Ball Mitchell, LLP, Dallas, TX, for Defendant.

## MEMORANDUM AND ORDER

NANCY F. ATLAS, SENIOR UNITED STATES DISTRICT JUDGE

This insurance dispute is before the Court on the Motion for Summary Judgment [Doc. # 18] filed by Plaintiff North American Capacity Insurance Company ("NAC"), to which Defendant Colony Specialty Insurance Company ("Colony") filed a Response and Cross–Motion for Summary Judgment [Doc. # 20], NAC filed a Response to Colony's Motion and a Reply in support of its own Motion [Doc. # 21], and Colony filed a Reply in support of its Motion [Doc. # 22]. Having reviewed the record and the applicable legal authorities, the Court **denies** NAC's Motion and **grants** Colony's Motion.

## I. BACKGROUND

Dolce Living Rosenberg, LLC ("Dolce") owns apartment complexes in Rosenberg, Texas. Pace Realty Corporation ("Pace") manages the properties for Dolce. On May 7, 2015, Ronald Burdick, a prospective tenant, was at one of Dolce's apartment complexes viewing apartments available for lease. Burdick fell from a golf cart operated by a Pace employee, and he subsequently died from his injuries. Burdick's wife and adult daughters sued Dolce, Pace, and the driver of the golf cart (the "Burdick Lawsuit"). Dolce was nonsuited, and the case ultimately settled.

The Apartment Management Agreement ("Management Agreement") between Dolce and Pace provides that "Owner [Dolce] agrees that Owner's insurance shall be primary without right of subrogation against Manager with respect to all claims, actions, damage, loss or liability in or about the Project." *See* Management Agreement, Exh. 1 to NAC's Motion, APP 4–5.

Dolce obtained a general liability policy from Certain Underwriters of Lloyds Syndicate ("Lloyds"), with a policy limit of $1 million ("Lloyds Policy"). Lloyds provided a defense in the Burdick Lawsuit, and it paid its policy limits as part of the settlement of that lawsuit.[1] Dolce is also an insured under a Commercial Liability Umbrella Policy ("Colony Umbrella Policy") issued by Colony to ARM Purchasing Group ("ARM"), with a policy limit of $10 million. As Dolce's real estate manager, Pace is an insured under the Lloyds and

---

1. The terms of the Burdick Lawsuit settlement are confidential, but it is undisputed that, after Lloyds paid its $1 million policy limit, the remaining settlement amount was within the $1 million limit of NAC's Commercial General Liability Policy issued to Pace. It is also undisputed that NAC paid the remaining settlement amount.

the Colony policies. The Colony Umbrella Policy contains an "other insurance" provision that reads:

> This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

Colony Umbrella Policy, Exh. 4 to NAC's Motion, APP 112.

Pace independently obtained a Commercial General Liability Policy from NAC ("NAC Policy"), with a policy limit of $1 million.[2] The NAC Policy includes a Real Estate Property Managed endorsement that reads:

> With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you.

See NAC Policy, Exh. 5 to NAC Motion, APP 213.

After NAC paid funds within its policy limits as part of the settlement of the Burdick Lawsuit, it filed this lawsuit against Colony. NAC argues that its insurance is excess and Colony has primary coverage for the balance of the Burdick Lawsuit settlement amount remaining after Lloyds paid its policy limits. Alternatively, NAC argues that it and Colony share coverage on a *pro rata* basis. NAC argues that, under either theory, Colony must reimburse NAC for some or all of the funds it paid in settlement of the Burdick Lawsuit. Colony argues that its insurance is excess and NAC has primary coverage. The parties filed cross-motions for summary judgment, which have been fully briefed and are now ripe for decision.

**2.** Pace also purchased an umbrella policy from Torus Insurance Company, with $4 mil-

## II. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment Standard

█ The Federal Rules of Civil Procedure provide for summary judgment where there are no genuine issues of material fact and the moving party "is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a). "[S]ummary judgment is appropriate where the only issue before the Court is a pure question of law," *Kornman & Associates, Inc. v. United States,* 527 F.3d 443, 450 (5th Cir. 2008). "The interpretation of an insurance policy's language presents a question of law." *Progressive Gulf Ins. Co. v. Estate of Jones,* 958 F.Supp.2d 706, 708 (S.D. Miss. 2013). When the parties file cross-motions for summary judgment, the Court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid–Continent Cas. Co. v. Bay Rock Operating Co.,* 614 F.3d 105, 110 (5th Cir. 2010).

### B. Construction of Insurance Policies

█ Under Texas law, courts interpret insurance policies using the same rules that apply to contracts generally. *See Potomac Ins. Co. of Ill. v. Jayhawk Med. Acceptance Corp.,* 198 F.3d 548, 550 (5th Cir. 2000) (citing *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex. 1987)). When interpreting an insurance policy, the Court's primary objective is to ascertain the parties' intent as expressed in the written document. *See Mid–Continent Cas. Co. v. Swift Energy Co.,* 206 F.3d 487, 491 (5th Cir. 2000) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1995)).

lion in excess coverage over NAC. The Torus policy is not at issue in this lawsuit.

When considering multiple insurance policies, Texas law generally requires that the limits of primary policies be exhausted before an excess insurer becomes liable. *See St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 209 & n.23 (5th Cir. 1996) (citing *Emscor Mfg., Inc. v. All. Ins. Group*, 879 S.W.2d 894, 903 (Tex. App.–Houston [14th Dist.] 1994, writ denied)). The liability of an insurer with primary coverage attaches upon the happening of the "occurrence" that gives rise to the liability. *See id.* An insurer providing excess coverage is generally only liable for the amount above what might be collected from primary insurance. *See id.* A primary policy and an excess insurance policy do not cover the same risk but, instead, cover "separate and clearly defined layers of risk." *See id.*

Conflicts involving the priority of insurance policies may arise when "more than one policy covers the same insured and each policy has an 'other insurance' clause which restricts its liability by reason of the existence of other coverage." *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 586 (Tex. 1969). The "dominant consideration" is the rights of the insured and, therefore, the following rule is applied under Texas law to reconcile such conflicts:

> When, from the point of view of the insured, she has coverage from either one of two policies but for the other, and each contains a provision which is reasonably subject to a construction that it conflicts with a provision in the concurrent insurance, there is a conflict in the provisions .... [This conflict is] solved by ignoring the two offending provisions.

*Id.* at 589.

## III. ANALYSIS

An umbrella policy is designed to cover situations where primary insurance policies are exhausted without covering the full loss. *See Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 714 (Tex. App. –Houston [14th Dist.] 1987, no writ). "Umbrella policies are therefore regarded as true excess over and above any type of primary coverage including excess provisions arising from primary policies." *Id.* at 715.

As the parties agree, the general rule is that a primary insurance policy must be exhausted before an umbrella, or excess, insurance policy is triggered. *See id.; St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 209 (5th Cir. 1996) ("Texas law dictates that primary policies' limits must be exhausted before excess insurers become liable"). In this case, it is undisputed that the NAC Policy is a primary policy and not "a true excess policy." *See* NAC Motion, p. 1. NAC argues that its Policy is "excess in nature" or "excess by coincidence." *See id.* at 10. "True excess policies, which require the policyholder to obtain primary insurance in addition to the excess policy, are only triggered when that additional insurance is exhausted." *Nat'l Cas. Co. v. W. World Ins. Co.*, 669 F.3d 608, 617 n.6 (5th Cir. 2012). Policies that are "excess by coincidence," on the other hand, do not require the insured to obtain other coverage and "only limit the insurer's responsibilities when the policyholder happens to have another policy covering the same incident." *Id.* As a general rule, when a "true excess" policy and an "excess by coincidence" policy cover the same loss, coverage under the "true excess" policy is not triggered until the limits of the "excess by coincidence" policy are exhausted. *See Carrabba*, 742 S.W.2d at 715; *Scottsdale Ins. Co. v. Steadfast Ins. Co.*, 2017 WL 661520, *6 (S.D. Tex. Feb. 17, 2017) (Rosenthal, J.).

Notwithstanding this general rule, NAC argues that the Colony Umbrella Policy is

716

not an excess policy as to the NAC Policy and, therefore, the Colony Umbrella Policy must be exhausted before NAC's "excess by coincidence" Policy is triggered. The record and applicable case law fail to support NAC's argument that its Policy is excess to the Colony Umbrella Policy.

### A. NAC Policy—"Excess by Coincidence"

It is undisputed that the NAC Policy is generally a primary policy. NAC notes that its Policy contains a Real Estate Property Managed endorsement that reads:

> With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you.

See NAC Policy, Exh. 5 to NAC Motion, APP 213. NAC argues that this provision causes the Policy to be "excess by coincidence" because its insured's liability arose out of its management of property for which it was acting as real estate manager, and because there was other valid and collectible insurance available to Pace. It is undisputed that the Lloyds Policy, the limits of which have been paid in settlement of the Burdick Lawsuit, is "other valid and collectible insurance" available to Pace. NAC argues that this provision also renders its Policy "excess by coincidence" as to the Colony Umbrella Policy. Colony does not challenge NAC's position that the NAC Policy is "excess by coincidence," but disputes that the NAC Policy provides coverage that is excess to that provided by the Colony Umbrella Policy.

### B. Colony Umbrella Policy

■ The Colony Umbrella Policy provides that it "is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis." See Colony Umbrella Policy, APP 112. This language establishes that the Colony Umbrella Policy is written as a "true excess policy," an issue not in dispute in this case. NAC argues, however, that two other provisions in the Colony Umbrella Policy establish that it is not an excess policy as to the NAC Policy.

*"Scheduled in the Declarations."*—The Insuring Agreement provision of the Colony Umbrella Policy provides that Colony will pay "the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage'" to which the policy applies. See id. at APP 101. NAC notes that the Colony Umbrella Policy defines "Retained limit" to mean "the available limits of 'underlying insurance' scheduled in the Declarations ..." See id. at APP 116. NAC argues that, because the NAC Policy was not "scheduled in the Declarations" of the Colony Umbrella Policy, the policy issued by Colony is not excess as to the NAC Policy.

■ Under general Texas law, however, the failure to list the primary policy in the declarations schedule does not affect the umbrella policy's status as excess over that primary policy. See Carrabba, 742 S.W.2d at 715. "[W]here an umbrella policy provides coverage for a loss in excess of the underlying policies listed in its schedule *and in excess of the applicable limits of any other underlying insurance collectible by the insured,* all such other collectible insurance must be exhausted before liability attaches under the umbrella policy." See id. (emphasis added).

The specific argument regarding failure to include the primary policy in the umbrella policy's declaration schedule was also made in *Starnet Insurance Co. v. Federal Insurance Co.* In that case, the umbrella policy issued by Federal Insurance Company (the "Federal Policy") listed one primary policy but not another. The insurer whose policy was not specifically

listed argued that, as a result, the Federal Policy was not excess to its unscheduled policy. *See Starnet Ins. Co. v. Fed. Ins. Co.*, 2017 WL 1293578, *6 (W.D. Tex. Apr. 6, 2017). The Western District court, in its well-reasoned and persuasive decision, stated that the primary insurer's argument "ignores the role its own policy played in protecting" the insured. *See id.* The primary policy "afforded primary coverage and only became excess if another primary policy applied, provided the other primary policy did not have a conflicting 'other insurance' clause." *Id.* "Comparatively, the Federal Policy provided either excess or umbrella coverage for all the events to which it applied." *Id.* "As primary and excess insurance policies cover separate and clearly defined layers of risk, the Federal Policy protected [the insured] against a second layer of risk while both the [primary policies] were responsible for the first layer." *Id.* (internal quotations and citations omitted); *see also Scottsdale*, 2017 WL 661520 at *6.

As in *Starnet*, Colony's failure to list the NAC Policy in the declarations page of its Umbrella Policy, a "true excess" policy, does not cause the excess policy to become primary and the primary policy to become excess. The "Retained Limit" definition of the Colony Umbrella Policy does not support NAC's argument that its policy is excess to Colony's.

***"Specifically Written as Excess."***— The Colony Umbrella Policy provision identifying the insurance provided thereby as "excess," provides further that this "excess" condition "will not apply to insurance specifically written as excess over this Coverage Part." *See* Colony Umbrella Policy, APP 112. NAC argues that this provision causes the Colony Umbrella Policy not to be an excess policy as to the NAC Policy.

NAC first supports this argument with the language from its own policy that provides:

> With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you.

*See* NAC Policy, APP 213. This language, which causes the NAC Policy to be "excess by coincidence," does not support NAC's argument that its policy was "specifically written as excess over [the Colony Umbrella Policy]." Indeed, the language does not indicate that the NAC Policy was "specifically written" to be an excess policy. Instead, as NAC concedes, its policy is "excess by coincidence." Moreover, the language in the NAC Policy does not support the argument that it was "specifically written as excess" ***over the Colony Umbrella Policy.***

NAC argues that the NAC Policy was "specifically written" to be an excess policy because Dolce and Pace agreed in their Management Agreement that Dolce's insurance would be primary without right of subrogation against Pace. *See* Management Agreement, APP 4–5. Therefore, NAC argues, the Colony Umbrella Policy issued to Owner/Dolce is primary to the NAC Policy issued to Manager/Pace. This provision of the Management Agreement between Dolce and Pace is not part of the NAC Policy or the Colony Umbrella Policy and, as a general rule, would not be considered a term of the policies and would not be binding on NAC and Colony.

NAC argues that "Texas law allows a separate contract to be incorporated into an insurance policy by reference to that document." *See* NAC's Reply [Doc. # 21], p. 4 (citing *In re Deepwater Horizon*, 470 S.W.3d 452, 460 (Tex. 2015). It is clear, however, that neither the NAC Policy nor

the Colony Umbrella Policy specifically references the Management Agreement. Therefore, the exception identified in *Deepwater Horizon* does not apply in this case. NAC argues that reference in the Colony Umbrella Policy to "other insurance" manifests an intent to incorporate extrinsic evidence. NAC cites no legal authority to support its argument that reference to one document (or type of document) in an insurance policy allows the Court to consider any and all other extrinsic evidence to construe the policy, and this Court is aware of none. Additionally, NAC's argument regarding the incorporation of the Management Agreement into the Colony Umbrella Policy is contrary to the actual policy language, which states that the "policy contains all the agreement between you and us concerning the insurance afforded." *See* Colony Umbrella Policy, APP 98. The Colony Umbrella Policy does not "contain" or even reference the Management Agreement between Dolce and Pace and, consequently, the Management Agreement is not part of the policy.

The NAC Policy was not "specifically written as excess" to the Colony Umbrella Policy. As a result, the exception to the "excess" language in the Colony Umbrella Policy does not apply to preclude Colony's status as an excess insurer as to the NAC Policy.

### C. *Pro Rata* Coverage Under *Hardware Dealers*

▪ NAC argues that even if Colony's coverage is excess, the conflicting "other insurance" provisions in the NAC Policy and the Colony Umbrella Policy require that they share coverage on a *pro rata* basis, citing *Hardware Dealers Mut. Fire Ins. Co. v. Farmer's Ins. Exchange*, 444 S.W.2d 583 (Tex. 1969). In *Hardware Dealers*, however, both policies at issue were primary policies. Here, the dispute is between a primary policy (the NAC Policy) and an umbrella policy (the Colony Um-

brella Policy). "The policies are not of the same character; they do not supply coverage at the same level." *Carrabba*, 742 S.W.2d at 715. "The 'other insurance' clauses of a primary policy with an excess clause and an umbrella policy are not equivalent and are not mutually repugnant so that they cancel one another." *Id.*; *see also Liberty Mut. Ins. Co. v. U.S. Fire Ins. Co.*, 590 S.W.2d 783, 785 (Tex. Civ. App.–Houston [14th Dist.] 1979, writ ref'd n.r.e.). As a result, *Hardware Dealers* does not provide for *pro rata* coverage between a primary policy and an umbrella policy.

### D. Conclusion Regarding Priority of Policies

The NAC Policy is a primary policy that is "excess by coincidence." The Colony Umbrella Policy is a true excess policy. No language in the Colony Umbrella Policy changes the insurers' relative priority. Because the two policies "are not of the same character," they are not "mutually repugnant" and *pro rata* coverage under *Hardware Dealers* is not available. NAC's primary coverage limit of $1 million must be exhausted before Colony's excess coverage is triggered.

### IV.   CONCLUSION AND ORDER

For the reasons stated above, NAC's Policy provides primary coverage and Colony's Umbrella Policy provides only excess coverage. As a result, NAC's $1 million policy limits must be exhausted before coverage under the Colony Umbrella Policy is triggered, and it is hereby

**ORDERED** that NAC's Motion for Summary Judgment [Doc. # 18] is **DENIED** and Colony's Motion for Summary Judgment [Doc. # 20] is **GRANTED**. The Court will issue a separate final judgment consistent with this Memorandum and Order.

SIGNED at Houston, Texas, this **7th** day of **August, 2017.**